IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GW ACQUISITION CO., LLC,            )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          1:23-cv-1207 (LMB/WEF)
                                    )
PAGELAND LIMITED LIABILITY          )
    COMPANY, et al.,                )
                                    )
            Defendants.             )

## MEMORANDUM OPINION

Before the Court is plaintiff GW Acquisition Co., LLC's Motion for Temporary
Restraining Order [Dkt. No. 2] and Motion for Preliminary Injunction [Dkt. No. 11] to require
defendants Pageland Limited Liability Company and Kimberly and David Mitchell to approve
Proffers in accordance with the express terms of a valid and enforceable land sale contract. For
the reasons that follow, GWA's Motion for Preliminary Injunction will be granted [Dkt. No. 11],
and its Motion for Temporary Restraining Order will be denied as moot [Dkt. No. 2].

## I. BACKGROUND

### A. Factual Background

This civil action concerns a dispute arising out of the Prince William County Digital
Gateway Project ("Digital Gateway Project" or "Project"), a controversial redevelopment project
which proposes to convert 2,100 acres of rural land in Prince William County into a data center
corridor. Plaintiff GW Acquisition Co., LLC ("plaintiff," "GWA," or "Buyer"), a developer
involved in the Project, initiated this civil action against defendants Pageland Limited Liability
Company ("Pageland") and Kimberly S. Mitchell and David C. Mitchell, Trustees of the
Kimberly and David Mitchell 2021 Irrevocable Trust, (the "Mitchells") (collectively,

"defendants" or "Sellers") to force them to comply with the terms of their Purchase and Sale Agreements ("PSA") to sell parcels of land to GWA.

This is not the first time that GWA and Pageland have found themselves on opposing sides in federal court. Pageland has previously attempted to breach the PSA to obtain a higher purchase price for its property. See GW Acquisition Co., LLC v. Pageland Ltd. Liab. Co., No. 1:22-cv-255, 2023 WL 125018 (E.D. Va. Jan. 6, 2023) ("Pageland I"). In that civil action, Pageland was ordered to "support and cooperate with plaintiff GW Acquisition Co., LLC in pursuing and obtaining approval of the Data Center Rezoning application." See id. [Dkt. No. 179] at 2. As this Court found in Pageland I, this civil action "boil[s] down to a case of sellers' remorse," GW Acquisition Co., LLC v. Pageland Ltd. Liab. Co., No. 1:22-cv-255, 2023 WL 3294123 (E.D. Va. May 5, 2023) (Brinkema, J.), wherein Pageland, and now the Mitchells, have refused to abide by the terms of their signed agreements which require them to cooperate fully in the pursuit of the County's approval of the Project.[1]

Contractual Relationship Between the Parties

On October 27, 2021, GWA entered into PSAs with Pageland and the Mitchells pursuant to which both agreed to sell certain real property comprising approximately 175 acres. [Dkt. No. 1] at Exs. A, B. The 175 acres are part of a larger redevelopment effort by GWA in the Digital Gateway Project. The GWA assemblage includes over 812 acres of land, currently owned by Pageland, the Mitchells, and other landowners, all of which are subject to PSAs with GWA.[2]

---

[1] In Pageland I, this Court ordered Pageland to pay more than $735,000 of GWA's legal expenses and related costs incurred. Pageland has noticed an appeal of that decision.

[2] GWA is not the sole developer involved in the Digital Gateway Project. During the hearing on the Motion for Preliminary Injunction, GWA informed the Court that Compass Data Centers is also purchasing and developing land and is subject to the County's regulation and approval process. [Dkt. No. 39].

In November 2022, Prince William County approved a Comprehensive Plan Amendment which redesignated the Digital Gateway corridor from agricultural and rural uses to allow for technology and data center development. [Dkt. No. 3] Ex. 2 at ¶ 3. GWA is now in the process of securing site-specific rezonings, which require certain Proffers[3] to ensure the property has the necessary infrastructure to support the data center development. Id. Virginia law requires written acknowledgement by the landowners of any proffered condition "prior to a public hearing before the governing body." See Va. Code. § 15.2-2298; see also PWC Ord. § 32-700.30.

Purchase and Sale Agreements

GWA alleges that to ensure compliance with all conditions and timelines established by Prince William County, meticulous coordination is required between GWA and each seller of land. "Each parcel of land is integral to this coordinated and complementary effort required to successfully complete each step of the rezoning process." [Dkt. No. 12] at 7. The PSAs employed by GWA contain provisions designed to ensure that each landowner cooperates in a timely and meaningful manner in the Data Center Rezoning process, by requiring landowners to support and cooperate with GWA's rezoning efforts. Specifically, § 7.2 of the Sellers' PSAs provides in part:

> Rezoning. . . . Seller hereby agrees, and all other Project Site Sellers
> have agreed, under their respective Project Site Purchase
> Agreements, to actively and fully support and cooperate with
> [GWA], using commercially reasonable, diligent and good faith
> efforts, in pursuing and obtaining the approval of the Data Center
> Rezoning, including promptly signing such documents as may be

---

[3] A Proffer or Proffered Condition is a voluntary commitment from a landowner or developer to reduce or eliminate the impact of new development on neighboring properties and the county. Once Proffers are accepted, they become a part of the zoning regulations applicable to the property.

required in connection with obtaining such approval [of the Data Center Rezoning].

See [Dkt. No. 1] Ex. A, § 7.2; Ex. B, § 7.2. Further, the Sellers' required cooperation extends to the approval and execution of proffered conditions that may be required by Prince William County throughout the rezoning process. Section 7.2.2 of the Sellers' PSAs provides:

> Proffers or other Conditions. In the event the authorities of Prince William County require Purchaser or Seller, in order to obtain approval of the Data Center Rezoning, to agree to certain proffered conditions that may affect the Land, or if Purchaser desires to submit any proffers in connection with obtaining the Data Center Rezoning that may affect the Land ("Proffers"), Purchaser shall provide copies of such Proffers or proffered conditions to Seller for its review prior to Purchaser agreeing to any such proffered conditions. All Proffer(s) shall be subject to the prior written approval of Seller, which approval shall not be unreasonably withheld, conditioned or delayed. Seller agrees to promptly execute the Proffers when requested by Purchaser, subject to the foregoing right to approve.

See id. Under § 7.2.2 there is a "two-step process," whereby the proposed Proffers must first be reviewed and approved by the Sellers who must communicate that approval to GWA. The second step requires the Sellers to sign the Proffers within one week of the Proffers being submitted to the Board of County Supervisors for its approval of the rezoning application. [Dkt. No. 39] at 16-17.

On August 28, 2023, GWA provided copies of Proffers via e-mail to all landowners, including Pageland and the Mitchells. [Dkt. No. 12] Ex. 1 at 1-5.[4] The next day, Pageland and the Mitchells were provided a second copy of the Proffers via e-mail and by letter. Id. Exs. 3, 4. Each communication requested review and approval of the Proffers by September 6, 2023, id.,

---

[4] GWA asked for approval of two Proffers—the North Proffer and the South Proffer—which established a set of conditions to which Sellers would affirm that the land being sold shall be in substantial conformance with a set of detailed requirements. See generally [Dkt. No. 12] Ex. 1 at 7-139.

4

because GWA alleges that prompt review and approval was necessary to abide by the schedule promulgated by Prince William County for timely rezoning, which includes review and public hearings before the Prince William County Planning Commission (the "Planning Commission") and Board of County Supervisors (the "Board" or "BOCS"). [Dkt. No. 12] Ex. 2 ¶ 5. Although the Sellers do not yet have to sign the Proffers, GWA alleges that without all the Sellers advising GWA that they approve the Proffers, GWA's rezoning application cannot move forward in the Planning Commission or Board processes. [Dkt. No. 12] Ex. 2 ¶ 7.

Hearings Before the Planning Commission and Board of County Supervisors

Final County approval for the Data Center Rezoning will involve two hearings: one before the Planning Commission and one before the Board. Id. ¶ 5. After the Planning Commission hearing, the date of which is yet to be finalized, the Planning Commission will issue a recommendation to the Board as to the rezoning of the Project site. The Board will make the final decision as to whether the proposed Project may go forward.

On July 30, 2023, the Chair of the Board, Ann Wheeler, sent an email to Prince William County Executive Christopher Shorter, in which she stated, "I am scheduling these two QTS[5] rezoning cases noted below to be heard by the Board of County Supervisors at our November 21, 2023 meeting and they are now on that agenda." [Dkt. No. 12] Ex. 5.[6] Moreover, Wheeler wrote, "I would appreciate your assistance in working with all relevant agencies and our planning staff to conclude our staff evaluation / recommendations and schedule a Planning Commission hearing in a timely manner so that we stay on track to hear these cases as now

---

[5] QTS Data Centers is a subsidiary company of plaintiff GW Acquisition Co. LLC. [Dkt. No. 1-1] at 26; [Dkt. No. 1-5] at 2.

[6] The e-mail provides that the two cases placed on the agenda were REZ 2022-0032 (Digital Gateway North) and REZ 2022-0033 (Digital Gateway South). [Dkt. No. 12] Ex. 5.

scheduled for the Board of County Supervisors on November 21, 2023." Id.  As alleged by

GWA, Wheeler sent this communication  pursuant to Virginia Code § 15.2-2286.A.7 and Prince

William County Ordinance § 32-700.43, which require the Board to vote on rezoning

applications within one year of the application being filed.

On September 19, 2023, the Board voted to amend its meeting calendar, moved the

November 21, 2023 meeting to November 28, 2023, and consolidated three land use applications

for public hearings and votes on December 12, 2023, two of which being Digital Gateway North

and Digital Gateway South.  The amendment to the Board's meeting calendar required a formal

vote by the Board per its Rules of Procedure, which provide in part:

> The Board may change the date, time, or place of any regular
> meeting to another date, time, or place, when such meeting conflicts
> with any holiday or any such change is otherwise deemed necessary
> by the Board, or it may establish additional regular meetings in any
> month.  Such change to, or addition of a regular meeting may be
> accomplished by adoption of a resolution changing, or adding a
> regular meeting date, done at a regular or special meeting, which is
> provided for in this section.

See BOCS Rules of Procedure A(1)(b).  The Rules do not require that a vote be taken to change

the substantive agendas or hearings scheduled for particular dates.

Termination Clause in the Purchase and Sale Agreements

The PSAs include language that allows for the parties to terminate the entire agreement if

the rezoning applications are not voted on by the Board within a defined period.  Section 7.2.3

provides in part:

> Outside Date for Rezoning. If a decision approving or disapproving
> the application for the Data Center Rezoning has not been made by
> the BOCS by August 15, 2023, either party may terminate this
> Agreement by written notice to the other; provided, however, that if
> by August 15, 2023, a hearing to vote on the Data Center Rezoning
> is scheduled to occur on or before December 30, 2023, such
> termination date may be extended through the scheduled hearing

date (together with additional time thereafter to obtain a final, non-
appealable decision), upon request by either party.

[Dkt. No. 1] Exs. A, B.  In effect, § 7.2.3 provides the parties the contractual option to extend the

termination date if two conditions are met: 1) that a Board hearing to vote on the rezoning

application is scheduled by August 15, 2023, and 2) the scheduled hearing is to take place before

December 30, 2023.  GWA notified Pageland and the Mitchells of its decision to exercise its

authority under § 7.2.3 in writing on August 9, 2023.  [Dkt. No. 12] Exs. 6, 7.

     Alleged Breach

     On August 30, 2023, Pageland provided written notice to GWA that it was terminating its

PSA pursuant to § 7.2.3 claiming that the method by which Wheeler scheduled the public

hearing on GWA's rezoning applications falls outside "accepted standard BOCS practice"

because the agenda for the November 21, 2023 meeting was not finalized by August 15, 2023.

[Dkt. No. 12] Ex. 8.  Similarly, the Mitchells communicated their intent to terminate the PSA on

the same basis as Pageland.   Given their view that they have terminated their PSAs, Pageland

and the Mitchells have refused to approve the Proffers in the proposal GWA has submitted to the

Planning Commission.  They are the only landowners who have refused to approve the Proffers

at issue in this civil action.  [Dkt. No. 12] at 12.  GWA argues that it will sustain irreparable

harm caused by Pageland's and the Mitchells' breach of §§ 7.2.2 and 7.2.3 of the Sellers' PSAs,

which "puts the entire, years-long redevelopment effort at risk."  [Dkt. No. 12] at 10.

    **B.  Procedural History**

     On September 8, 2023, GWA filed a six-count complaint against Pageland and the

Mitchells, [Dkt. No. 1], seeking declaratory judgments against Pageland and the Mitchells stating

that each defendant is required to approve the Proffers necessary for GWA to obtain approval of

the rezoning (Count I and Count II, respectively); specific performance of § 7.2 against Pageland

and the Mitchells as to the Proffers (Count III and Count IV, respectively); and breach of

contract against Pageland and the Mitchells, seeking $75,000 or more in damages (Count V and

Count VI, respectively).  Id. ¶¶ 25-14.  Simultaneously, GWA filed the pending motions for

injunctive relief.  [Dkt. Nos. 2, 11].

On September 25, 2023, the Court held a preliminary injunction hearing at which the

parties presented argument on the issues pertinent to both motions.  The Court will analyze the

issues in accordance with the preliminary injunction standard and deny the temporary restraining

order motion as moot.

## II. DISCUSSION

### A. Standard of Review

A plaintiff seeking a temporary restraining order or preliminary injunction must be able

to show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).[7]  No

single factor is determinative.

### B. Analysis

#### 1. Likelihood of Success on the Merits

"A party seeking a preliminary injunction must establish that he is likely to succeed on

the merits of at least one claim."  Roe v. Shanahan, 359 F. Supp. 3d 382, 409 (E.D. Va. 2019).

To meet this burden, the party must show more than merely "a grave or serious question for

---

[7] Although a temporary restraining order may be issued ex parte, Fed. R. Civ. P. 65(a)(1)
prohibits the issuance of a preliminary injunction "without notice to the adverse party."  There is
no specific amount of time required for this notice, but defendants must be "given a fair
opportunity to oppose the application."  Granny Goose Foods, Inc. v. Brotherhood of Teamsters
& Auto Truck Drivers Loc. No. 70, 415 U.S. 423, 433 n.7 (1974).

litigation," Sarsour v. Trump, 245 F. Supp. 3d 719, 729 (E.D. Va. 2017) (emphasis and citation omitted), but need not show "a certainty of success," League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted). Here, the parties do not dispute that GWA has executed enforceable contracts with Pageland and the Mitchells. For example, neither Pageland nor the Mitchells dispute that they are required "to actively and fully support and cooperate with [GWA], using commercially reasonable, diligent and good faith efforts, in pursuing and obtaining the approval of the Data Center Rezoning, including promptly signing such documents as may be required in connection with obtaining such approval [of the Data Center Rezoning]," to promptly review any Proffers GWA submits, and to approve them absent the Proffers being unreasonable. [Dkt. No. 1] Ex. A § 7.2.2; Ex. B § 7.2.2. Importantly, Sellers do not argue that the underlying Proffers are unenforceable, i.e., that the Proffers are defective or unreasonable in violation of § 7.2.3. The Sellers also do not dispute that on August 28, 2023, GWA provided them with sets of Proffers and asked each to approve them on or before September 6, 2023. [Dkt. No. 12] Ex. 1. It is uncontested that both Pageland and the Mitchells failed to approve the Proffers by September 6, 2023, as requested.

The core issue in this litigation is Sellers' claim that they are entitled to terminate their PSAs. Pageland indicated that it was terminating the PSA pursuant to § 7.2.3, while counsel for the Mitchells reiterated his clients' unwillingness to timely approve the Proffers and "reaffirm[ed]" that the Mitchells' may ultimately attempt to terminate their PSA. [Dkt. No. 12] Ex. 10.[8]

---

[8] GWA has submitted supplemental briefing demonstrating that the Mitchells purport to have terminated the PSA pursuant to § 7.2.3 on October 2, 2023. [Dkt. No. 46] Ex. A ("I am writing to provide you with formal notice that the Seller hereby exercises its option under Section 7.2.3 of the PSA to terminate the Agreement. As you know from my correspondence dated September

As an initial matter, Pageland's refusal to approve the Proffers defies a previous Order by this Court, in addition to a sworn commitment by its corporate representative. In Pageland I, this Court issued declaratory relief as to GWA, requiring Pageland to "cooperate with the Buyer on executing the Data Center Rezoning application . . . and avoid the risk of future litigation." See 2023 WL 125018, at *17 (E.D. Va. Jan. 6, 2023) (Brinkema, J.). Additionally, during a deposition in the previous litigation, Pageland's corporate representative swore under oath that Pageland intended to sign all Proffers in compliance with the PSAs and cooperate fully in the rezoning application process. See [Dkt. No. 12] Ex. 9 at 19-20. Given those predicates, Pageland's current refusal to comply with the PSAs and approve the proffers demonstrates yet another attempt to flout this Court's commands and the requirements of its signed contract with GWA.

Sellers' invocation of their termination rights under § 7.2.3 is unsupported by any authority, and instead relies on a strained reading of the bylaws, standard practices, and scheduling decisions of the Board. Pursuant to § 7.2.3, the termination right inures to Sellers if, and only if: 1) a decision approving the application for the rezoning has not been made by the Board by August 15, 2023; and 2) a hearing to vote on the rezoning is not scheduled by August 15, 2023 to take place on or before December 30, 2023. [Dkt. No. 1] Exs. A, B. The parties agree that a decision approving the rezoning application did not occur before August 15, 2023; but, despite Sellers' argument to the contrary, it is evident from the record that on July 30, 2023, Wheeler scheduled a vote to occur on the rezoning applications to take place on November 21, 2023, satisfying the conditions outlined in § 7.2.3 of the PSAs.

––––––––––––––––––––

6, we believe that the August 15, 2023 deadlines for voting on rezoning or scheduling a hearing to vote on the rezoning application set forth in Section 7.2.3 of the PSA have not been met.").

Pageland and the Mitchells argue that Wheeler's e-mail to the County Supervisor did not properly "schedule" the November 21, 2023 hearing on the rezoning application because the process was not "formal," [Dkt. No. 26] at 1, "official," id. at 4, nor was an agenda for that meeting "finalized," [Dkt. No. 12] Exs. 8, 11; however, neither the PSAs nor the Board Rules of Procedure support Sellers' argument.  First, neither document defines "schedule;" and second, neither sets out procedures for how a hearing or vote may be scheduled.  Under generally accepted rules of contract construction and interpretation, the word "schedule" must be given its natural and ordinary meaning in context.  PMA Cap. Ins. Co. v. U.S. Airways, Inc., 626 S.E. 2d 369, 372 (Va. 2006) ("Words that the parties used are normally given their usual, ordinary, and popular meaning.").  Here, scheduling connotes the "plan[ning] or appoint[ing] for a certain time or date."  See Am. Heritage Coll. Dictionary (3d ed.).  Wheeler did just that with respect to the rezoning applications.  In her e-mail to the County Executive, Wheeler plainly stated that the Digital Gateway Project applications were being scheduled for a hearing before the Board on November 21, 2023, pursuant to Virginia Code § 15.2-2286.A.7 and Prince William County Ordinance § 32-700.43.  In doing so, she set the wheels in motion for the appropriate County staff to prepare for the hearings to occur on November 21, 2023, requesting that the County Executive "work[] with all relevant agencies and [] planning staff" and affirming that the Digital Gateway Project hearings "are now on that [November 21, 2023] agenda."  [Dkt. No. 12] Ex. 5.

In addition to attacking how the meeting was scheduled, Sellers also claim that a public agenda had not yet been finalized at the time of Wheeler's July 30, 2023 e-mail.  To support their argument, Sellers point to Rule F(2) of the Board Rules of Procedure, which requires that "[t]he

Chair, with the County Executive, shall prepare an agenda for each meeting."[9]  They claim that "[t]his language indicates that collaboration and consent are necessary to place any issue on the agenda," underscoring their position that more formality and procedure is required to notice a matter for a particular public hearing.  [Dkt. No. 25] at 5.  But Sellers misread Rule F(2), which does not contain a requirement that a public agenda must be created either alongside or before the act of scheduling the underlying vote for a particular meeting.  The ministerial act of preparing and disseminating an agenda before the precise time and place of the meeting—which is governed by applicable regulation—cannot somehow be transformed into a requirement that the scheduling of a vote for that meeting must also follow the formal procedures governed by the Board Rules.  Such a reading would run counter to other provisions in the Rules, such as Rule F(2)(a), which provides that the agenda and its supporting materials be dispatched to the public "in preparation for the meeting," not prior to or concurrent with its scheduling or internal Board members' decisions to consider certain matters.

State law does not help defendants.  Virginia Code § 15.2-1813 requires only that the public receive notice of hearings "at least seven days prior to the date set for the hearing."  Id. Virginia law does not require that a Board of Supervisors must publicly disseminate its agenda months in advance of the scheduled meeting.  In this case, the Board has publicized its hearing dates well in advance of their occurrence, and its meeting agendas are routinely finalized days before the meeting date.  For example, the meeting agenda for the Board's September 12, 2023 meeting was finalized and made publicly available approximately one week before the meeting

---

[9] See Prince William County Board of County Supervisors Rules of Procedure, https://www.pwcva.gov/assets/documents/bcs/BOCS_Rules.pdf.

occurred. [Dkt. No. 12] at 19 & n.5. As this exhibit clearly shows, there is no merit to Sellers'

argument that a public agenda must be issued at the same time as a meeting or vote is scheduled.

Pageland, but not the Mitchells, also argues that Wheeler was not authorized to schedule

the rezoning applications for a vote during the November 21, 2023 hearing, claiming that Prince

William County zoning ordinances limit the Chair's ability to schedule a vote until the Planning

Commission's review is complete. See, e.g., [Dkt. No. 26] at 8-10; [Dkt. No. 25] at 8-10; [Dkt.

No.12] Ex. 8. Pageland's citation to PWC Ord. § 32-700.41 is inapposite because that ordinance

requires the Planning Commission to take certain actions as it relates to its own hearings and

recommendations; it does not require the Board to take specific actions before scheduling

hearings or votes of its own. In fact, having a hearing date set by the Board often allows the

Planning Commission to work backward in preparing materials, holding hearings, and making

recommendations so as to enable the Board to vote on a zoning issue.

The Board Rules provide that the Chair "shall prepare an agenda for each meeting" with

the help of the County Executive. [Dkt. No. 12] Ex. 12 §§ A(1)(a), F(2). Here, Wheeler notified

the Prince William County Executive on July 30, 2023 that GWA's rezoning cases were

scheduled for the November 21, 2023 meeting. Wheeler wrote, "I am scheduling these two QTS

rezoning cases noted below to be heard by the Board of County Supervisors at our November 21,

2023 meeting and they are now on that agenda." [Dkt. No. 12] Ex. 3.[10]  Section 7.2.3 only

requires that a hearing be scheduled before the Board, and one has been timely scheduled.[11]

Sellers next argue that the Board's vote on September 19, 2023 to move the November

21, 2023 meeting to November 28, 2023, and setting certain land use hearings and votes for the

December 12, 2023 meeting, indicate that formal Board action is required to schedule votes.

This argument is unsupported by the Board Rules.  Specifically, Rule A(1)(b) requires the Board

to vote to change the "date, time, or place of any regular meeting to another date, time, or place,"

id., but it does not say anything about the formality required to amend the substantive

discussions and reschedule votes to be held during those meetings.  In effect, Rule A(1)(b) is

immaterial to the question before the Court, which is whether before August 15, 2023 a meeting

was scheduled to take place to vote on the rezoning applications and that the meeting is set to

occur before December 30, 2023.  Clearly, this has happened.[12]

---

[10] Sellers argue that Wheeler's e-mail demonstrates the tentative nature of the scheduling:
"Please note that I may slightly amend this date at a future time depending upon the vacation
schedule of my colleagues and other issues that may arise."  [Dkt. No. 12] Ex. 5.  Nothing in this
language supports the argument that Wheeler's scheduling action was "premature [or] contrary
to procedural norms."  [Dkt. No. 25] at 6.  As is common in multi-member bodies, the
restrictions imposed by others' shifting calendars can impact items that are otherwise properly
scheduled.

[11] Wheeler publicly stated "[t]he decision to schedule the hearing was prompted by an email
from the applicant, which was sent after the one-year time limit set both by Virginia law and
county ordinance expired.  Contrary to certain assertions by a supervisor, the application had
always been posed for consideration by year-end."  Ann Wheeler, Why I Scheduled a November
21 Hearing on the Digital Gateway, PRINCE WILLIAM TIMES (Aug. 26, 2023),
https://www.princewilliamtimes.com/opinion/guest-opinion-why-i-scheduled-a-nov-21-hearing-
on-the-digital-gateway/article_2c3454ca-4410-11ee-a9bf-db53b8df003a.html.

[12] Sellers also claim that a vote was not properly scheduled pursuant to § 7.2.3 because the Board
did not satisfy prerequisites for being placed on the "consolidated land use public hearing
agenda."  [Dkt. No. 12] Ex. 8.  But consolidated land use public hearings are used by the Board
to streamline the hearing process for straightforward or low-profile land use matters, allowing
staff to dedicate time to higher profile disputes, such as the Digital Gateway Project.  Zoning

Sellers raise one final issue as to the merits of GWA's claim: GWA failed to comply with the 30-day notice-and-cure provision in the PSAs before filing its civil action and moving for injunctive relief. [Dkt. No. 26] at 12.  Section 17.6 of the PSAs provides:

> Notice and Cure Right. Prior to declaring a default and exercising the remedies described herein the non-defaulting party shall issue written notice of default to the defaulting party describing the event or condition of default in sufficient detail to enable a reasonable person to determine the action necessary to cure the default. The defaulting party shall have thirty 30 days from delivery of the notice in which to cure the default except for a failure to proceed to Closing as and when required pursuant to the terms of this Agreement or a failure by Purchaser to deliver the Purchase Price on the Closing Date as to which no cure period shall apply. If the default has not been cured within the applicable cure period the non-defaulting party may exercise the remedies described above.

[Dkt. No. 1] Ex. 1 at 25.  According to Pageland, GWA never responded to its August 30, 2023 termination notice, [Dkt. No. 26] at 12; instead, GWA filed this civil action on September 8, 2023.  GWA argues that Pageland's purported termination of its PSA, and the Mitchells' stated intention to do the same, render the cure provision in § 17.6 "a futile act," [Dkt. No. 33] at 11, because Sellers' repudiation excuses compliance with the contractual notice-and-cure provision.

Sellers' argument is unpersuasive.  Both Pageland and the Mitchells have demonstrated clear intentions "neither to . . . cure any alleged default of [their] obligations" under the PSAs, "nor to continue" with their agreements.  See Hippocratic Growth Maryland Processing LLC v. Pesce, 2022 WL 5245752, at *7 (D. Md. Oct. 6, 2022) (citing Recreonics Corp. v. Aqua Pools, Inc., 638 F. Supp. 754, 758 (D.S.C. 1986) (holding that, where a defendant terminates a contract and announces its intention not to perform, the defendant preempts the fulfillment of the

_____

cases on the standard public hearing agenda, as here, are not subject to the requirements laid out in Board Rule of Procedure F(9)(c).

condition precedent)).  Neither Pageland nor the Mitchells have indicated in their pre-litigation or post-litigation postures any intent to cure their failure to approve the Proffers submitted by GWA.  No amount of time would have resulted in any cured breach or avoided the need for the instant litigation.[13]

Ultimately, "when a contract has been made, and either party refuses to perform the agreement, equity enforces the performance of the contract specifically, by compelling the refractory party to fulfill his engagement according to its terms."  Griffin v. Griffin, 753 S.E.2d 574, 582 (Va. App. 2014); see also Stolz v. Fed. Commc'ns Comm'n, 882 F.3d 234, 240 (D.C. Cir. 2018).  Because the PSAs are enforceable contracts which clearly outline the processes by which Proffers must be reviewed and approved as part of GWA's rezoning applications with Prince William County, GWA is likely to succeed on the merits of its claim.

### 2. Irreparable Harm

GWA has adequately demonstrated that it will suffer irreparable harm if an injunction is not issued because Sellers' refusal to approve the Proffers endangers GWA's ability to have the Planning Commission and the Board fully assess its rezoning application, thereby putting the entire Project at risk.  Each day that Sellers continue to refuse to comply with their contractual obligations under § 7.2.2, or alternatively seek to terminate and withdraw from the PSAs under § 7.2.3, the rezoning applications—and the entire Digital Gateway Project—become jeopardized.

---

[13] This finding conforms with the previous litigation, in which Pageland made obvious its desire to terminate the agreement and seek a higher price for the land it previously agreed to sell to GWA.  See GW Acquisition Co., LLC v. Pageland Limited Liability Co., 2023 WL 125018, at *1, 16 (E.D. Va. Jan. 6, 2023) (Brinkema, J.) ("[T]he uncontested record reflects that these disputes boil down to a case of sellers' remorse," and further noting defendant's "history of failing to comply with the Purchase and Sale Agreement" and "obvious dissatisfaction with the GWA agreement" provided a reasonable basis for GWA to be concerned about his future cooperation).

GWA has presented evidence showing that Pageland's and the Mitchells' properties constitute necessary pieces in a complex, sizable land redevelopment project. By intent, design, and necessity, every parcel of land subject to a PSA in the Project is dependent on the inclusion of all others. GWA concretely articulated this fact at the preliminary injunction hearing when it explained the relative importance of Pageland's and the Michell's properties. Specifically, GWA explained that substations required for electrical generation, transmission, and distribution for the data centers are to be built on portions of the land Pageland and the Mitchells agreed to sell to GWA. "If those substations have to be moved, this entire project is gone. It's done. We're over. . . . The plan does not work without those two properties, period." [Dkt. No. 39] at 18-19. As the Fourth Circuit has previously explained, a developer undertaking a "complex project that can only progress in phases" suffers irreparable harm if a necessary parcel of land is withdrawn from the development plans at the eleventh hour. See E. Tenn. Nat. Gas. Co. v. Sage, 361 F.3d 808, 829 (4th Cir. 2004).

> Certain portions of the project have to be completed before construction can begin on other portions. Therefore, as the district court recognized, "any single parcel has the potential of holding up the entire project." Continuing, the court said, "[t]o require [the company] to build up to a parcel of land [it] do[es] not possess, skip that parcel, and then continue on the other side would prove wasteful and inefficient." Furthermore, [the company] is under an order from FERC to complete construction and have the pipeline in operation by January 1, 2005. It would not be possible to meet FERC's deadline without a preliminary injunction.

Id. (cleaned up).

Moreover, delay could unravel the Project. If Pageland and the Mitchells withhold their approval of the Proffers, resulting in the inability of either the Planning Commission or the Board to approve the rezoning applications before December 30, 2023, the PSAs for all landowners in the Project would become terminable. See [Dkt. No. 12] at 14; see also [Dkt. No.

17

1] Exs. A, B; [Dkt. No. 12] Ex. 2 ¶ 8.  It is undisputed that GWA stands to lose substantial

profits if the land is not rezoned.  These lost profits are difficult to quantify, making injunctive

relief more appropriate.  See HCI Techs., Inc. v. Avaya, Inc., 446 F. Supp. 2d 518, 521 (E.D. Va.

2006) ("[A] finding of irreparable harm is most appropriate where the plaintiff's damages are

difficult to calculate."), aff'd, 241 F. App'x 115 (4th Cir. 2007); see also Update, Inc. v.

Samilow, 311 F. Supp. 3d 784, 795 (E.D. Va. 2018).  Further, the Sellers' refusal to affirm the

Proffers is certainly increasing GWA's litigation costs and the cost of the transaction as a whole.

For example, GWA points to the vulnerability of all the PSAs given Sellers' breach, arguing that

the delay increases the likelihood of breaches or invalidations of other covenants.  A failure to

meet deadlines, the likelihood of lost profits, and increased construction costs in a multi-phase

project all tilt in favor of irreparable harm being inflicted on GWA by Sellers.[14]

　　　Pageland and the Mitchells are unlikely to be harmed by being required to approve the

Proffers under § 7.2.2 of the PSAs.  It is not a burdensome task, nor is it one with which they are

unfamiliar; and to the extent Sellers argue that there is some financial loss to them, this loss is a

result of their negotiating choices and signing the contracts, not a result of approving the

Proffers.  In fact, Pageland and the Mitchells would likely engender more financial hardship by

terminating the PSAs in two respects.  First, neither Pageland nor the Mitchells are guaranteed to

find alternative buyers for their parcels at prices at or exceeding GWA's multi-million dollar

contract prices.  Sellers' insistence on peering around the corner for a higher bidder may result in

---

[14] See Mountain Valley Pipeline, LLC v. Easements to Construct, Operate, & Maintain a Nat.
Gas Pipeline Over Tracts of Land in Giles Cnty., Craig Cnty., Montgomery Cnty., Roanoke
Cnty., Franklin Cnty., & Pittsylvania Cnty., Virginia, 2018 WL 648376, at *16 (W.D. Va. Jan.
31, 2018), objections sustained in part and overruled in part, 2018 WL 1193021 (W.D. Va. Mar.
7, 2018), aff'd sub nom., Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by
Sandra Townes Powell, 915 F.3d 197 (4th Cir. 2019).

no sale at all.  Second, and perhaps more worrisome, Pageland and the Mitchells risk exposing themselves to litigation by other developers and landowners involved the Project should their refusal to comply with their PSAs result in the Project not receiving zoning approval.

### 3. Balance of the Equities and Public Interest

The balance of the equities and public interest also favor GWA.  The enforcement of valid contractual obligations is consistent with public policy, and there is no public interest weighing against such enforcement.  Although the Digital Gateway Project is controversial and has spurred heated debate among its supporters and critics, that controversy is not relevant to the Court's analysis.

### III. CONCLUSION

At bottom, the parties have entered into valid land sale contracts which require Pageland and the Mitchells to approve the Proffers that are integral to GWA's rezoning applications.  Further, GWA has sufficiently demonstrated that without approval of the Proffers, there is a strong likelihood of the entire Digital Gateway Project not being approved, which would result in millions of dollars of losses for GWA and other landowners and developers.  Moreover, defendants have not presented sound arguments that they are entitled to terminate their contracts.  For these reasons, plaintiff's Motion for Preliminary Injunction [Dkt. No. 11] will be granted, and its Motion for a Temporary Restraining Order [Dkt. No. 2] will be denied as moot, by an Order to be issued with this Memorandum Opinion which will require the defendants to comply with their contractual obligations.

Entered this 6 day of October, 2023.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

19